**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**TRENNA S. PARKER**
Parker & Maguire Law Firm, P.C.
Noblesville, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
DCS Central Administration

**PATRICK M. RHODES**
Indiana Department of Child Services
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN RE THE INVOLUNTARY TERMINATION )
OF THE PARENT-CHILD RELATIONSHIP OF )
E.M., G.M., AND L.M.: )
)
B.M., )
)
    Appellant-Respondent, )
)
      vs. )    No. 29A02-1301-JT-64
)
THE INDIANA DEPARTMENT OF CHILD )
SERVICES, )
)
    Appellee-Petitioner. )
)

APPEAL FROM THE HAMILTON CIRCUIT COURT
The Honorable Paul A. Felix, Judge
The Honorable Todd L. Ruetz, Master Commissioner
Cause No. 29C01-1112-JT-1794
Cause No. 29C01-1112-JT-1795
Cause No. 29C01-1112-JT-1796

**August 30, 2013**

**FRIEDLANDER, Judge**

Father appeals the involuntary termination of his parental rights to his children, E.M., L.M., and G.M. (collectively, the Children). He challenges the sufficiency of the evidence supporting the juvenile court's judgment.

We affirm.[1]

Father and Mother are the biological parents of E.M., L.M, and G.M.[2] Mother and Father were married and living with the Children in Noblesville, Indiana when the Hamilton County Department of Child Services (DCS) became involved with the family in February 2010. At the time, the family was living in a home owned by Father's parents, who paid the expenses associated with the home and did not charge rent. Father was unemployed and the primary caregiver of the children, and Mother traveled out of the state for her job.

On or about February 5, 2010, DCS investigated a report of abuse and/or neglect regarding the Children. Upon entering the home, investigators found the home "filthy, with the kitchen covered in trash, no visible counter tops, trash and dirty diapers overflowing a garbage can, caked food on the kitchen table and also no clear space on the table, and feces smeared in multiple places in the home." *Appendix* at 54. Further, nearly two-year-old G.M. had a flat spot on his head, displayed little emotion or interactive or verbal skills, and was not

---

[1]   We note that Mother has filed a separate appeal regarding the termination of her parental rights under appellate cause number 29A02-1301-JT-89. The State has apparently prepared one brief to be filed in both appeals. Unfortunately, the State chose to cite to only Mother's appendix and not Father's throughout its brief. This has hampered our review, as only Father's appendix is before us in this appeal.

[2]   The Children were born in January 2005, April 2006, and April 2008, respectively.

walking yet. The children were also asking investigators for food. As a result of conditions discovered in the home, the Children were immediately detained by DCS.[3]

On February 8, CHINS petitions were filed alleging that the conditions of the home were unsafe, unsanitary, and unsatisfactory for the health and well-being of each child. The Children were placed in foster care following a detention hearing. At the fact-finding hearing on June 28, 2010, Mother and Father stipulated to facts establishing the Children to be CHINS. That same day, the court proceeded to disposition in which the court ordered the parents to participate in a plan of care to ensure a safe and stable home, including adequate supervision, care, food, and shelter. In addition to the Children remaining in foster care, the dispositional order provided that Mother and Father were to: maintain routine contact with DCS, the GAL, and other service providers, notify DCS and the GAL of any change in living situation, obtain/maintain housing and source of support or income sufficient for the care and safety of the Children, and participate in and successfully complete home-based therapy, a psychological assessment (for Father), comply with any terms of probation, and participate in visitation with the Children as arranged by DCS. The parents were subsequently provided with intensive services in an effort to reunify the family.

On August 4, 2010, DCS initiated the first trial home visit (THV) in which the Children were returned to the care of Mother and Father. The THV did not last two months. On October 1, 2010, the Children were detained by DCS because the family had been evicted

---

[3]   On March 23, 2010, the State filed criminal charges against Father relating to the findings of this investigation. Father was charged with three counts of class D felony neglect of a dependent. He pleaded guilty to one count of neglect on October 26, 2010 and was subsequently sentenced to 730 days incarceration suspended to probation.

from their home.  The detention order, issued October 4, provided in part:

> [Father] has not adequately participated in supporting or supervising [the Children], nor in assisting [Mother], to enable the children and mother to remain in the family home.  Additionally, the mother and father have been ejected from the family home by the landlords of that property, father's own parents, causing a lack of housing and a disruption in the schooling of the children as well.

*Exhibits*, Petitioner's Exhibit 26.  The Children were placed in foster care until Mother could secure financing sufficient to obtain housing for herself and the Children.

A second THV commenced in November 2010 in Mother's new residence.  Permanency hearings were held the following December and June.  Both parents failed to appear in person.  Following the first such permanency hearing, the court found Mother in compliance with the case plan and the dispositional order but not Father.  He had failed to participate in home-based therapy, failed to maintain housing or source of support or income, and had not completed a psychological evaluation.

By the time of the June 2011 permanency hearing, Father had moved back in with the family.  In its June permanency order, the court found Mother in compliance with the case plan.  The court noted, however, that Mother had reported to service providers that she was experiencing daily hallucinations.  The court found that although Father was currently in compliance with the case plan, he had only partially completed his psychological evaluation.  The court further indicated concern that Father was overseeing the Children while Mother worked:  "[Father] has previously been convicted of criminal offenses [sic] relating to child neglect, has left the family home for extended periods in the past, and has expressed a lack of commitment to remaining in the family home."  *Exhibits*, Petitioner's Exhibit 27.  In its

4

order, the court admonished the parents that they "must demonstrate continued ability to provide appropriate care and supervision over the children as support services are reduced, in order to maintain physical custody of the children in their home." *Id.*

At the time of the June hearing, the stated plan of DCS, the GAL, and other service providers was to gradually reduce services, which had been provided for approximately sixteen months. It was felt that Mother and Father were demonstrating dependence on the service providers, which could not continue indefinitely. The planned reduction in services was designed to determine whether the parents could independently maintain the Children in their home and fulfill parental obligations. Mother and Father were made aware of the planned reduction of services on multiple occasions.

Just over two months later, on August 19, 2011, the Children were removed from the parental home for a third time. This occurred after an impromptu visit by a service provider on August 18, who returned again the following day with law enforcement. The service provider discovered that food in the home was extremely scarce, parents had allowed their food-stamp eligibility to lapse and had not notified or requested help from service providers, and at least one child was complaining of being hungry. Mother and Father failed to appear in person at the detention hearing held on August 24. In its third set of detention orders, the court found probable cause to believe:

> [The Children's] mother and father have failed to provide adequate food and supervision, as well as [] failed to provide a safe and stable home for the children. The mother has not adequately addressed her own mental health issues, including having active hallucinations observed by engaged service providers. The [Children's] parents did not notify DCS, the GAL, or service providers that they did not have sufficient food on or about 8/18/11 or 8/19/11,

5

and indicated that they were going to sell house-hold items such as lamps and/or furniture to get money for food…. [Parents] also did not have enough money to pay their rent for the month of August, jeopardizing the ability to provide housing the [Children].

*Exhibits*, Petitioner's Exhibit 28. The children were returned to the foster family with whom they had been placed after their first removal.

On October 6, November 28, and December 5, 2011, an extended and contested permanency hearing was conducted. At the conclusion of the hearing, the court found that Mother and Father were not in compliance with the case plan. The court found in part:

The [parents have] demonstrated a history of being unable to obtain or maintain housing or source of support or income sufficient for the safe and appropriate upbringing of the [Children]. The family has a demonstrated history of marital instability, including the father's seeking relationships outside the marriage while in charge of the supervision of the [Children], leading to failures in such supervision. This instability has also contributed to the family having to move homes on multiple occasions, and lead to the inability of this Court to determine what the family unit structure will be at any given time during this extended CHINS case.

On or about 8/18/11, the third removal in this case was required because the biological parents had either been unwilling or unable to ensure an adequate supply of food for the children in their care….

The biological mother has had a running history of mental health instability. This has manifested itself in active hallucinations…. [She] has failed to stay current on her mental health medication during the CHINS case, and has relied on the biological father, when he has been part of the family unit structure, to provide supervision despite his own observed limitations. The Court has specifically observed that the biological father has had difficulty remaining awake during the permanency proceedings concluded on this date.

* * *

The biological parents have also been inconsistent and/or delinquent in participating in supervised visitation sessions since the third removal on 8/19/11. This has included missed visitation sessions and cancelled sessions because the parents have not been able to arrange transportation to attend such sessions.

*Exhibits*, Petitioner's Exhibit 29.

6

In sum, the court found that Mother and Father had been provided with twenty-one months of intensive reunification services geared to improve their parenting skills and to enable them to independently and appropriately provide for and raise their children. Despite these extended services, parents had failed two THVs, and neither of them had attained the ability to fulfill their parental obligations. Accordingly, the court approved a change in the permanency plan from reunification to termination of the parent-child relationship. Reunification services were suspended, although visitation was permitted to continue. On December 29, 2011, DCS filed petitions for involuntary termination of the parent-child relationship between Mother and Father and each of the Children.

Upon the recommendation of the GAL, DCS received court authorization in the CHINS proceeding to suspend visitation on February 22, 2012, pending a hearing on March 26, 2012. Although they had begun visiting more often after the permanency plan was changed to termination, the parents were now "unduly churning up the emotions of the children causing significant adverse and negative reactions by the children after the visitation had ended." *Exhibits*, Petitioner's Exhibit 31. Father and Mother both failed to appear in person at the March 26 hearing, where the GAL and the Family Case Manager (FCM) testified that it would be in the Children's best interest to terminate visits. The court ordered the continued suspension of visitation. The court also granted the GAL's request for pre-adoptive counseling for the Children and mental health assessments to address the emotional wellbeing of the Children in conjunction with their contact with Mother and Father. In the event that either of these services revealed that visitation would be in the Children's best

interest, the court indicated that DCS or any party could request a hearing regarding visitation.

On April 16, 2012, the court held an initial hearing in the termination case. Father appeared in the custody of the Hamilton County Sheriff's Department, as he had been charged with false informing and had been recently arrested for failing to appear in that matter.[4] On May 21, 2012, a permanency plan was held in the underlying CHINS case. The court found that neither parent was in compliance with the case plan at that time. The permanency plan remained termination.

On October 29, 2012, the evidentiary hearing in the termination case commenced. Mother and Father appeared approximately one hour and twenty minutes late. The hearing concluded on a second day, November 19, 2012. In addition to many of the facts as set out above, the current FCM testified that Mother and Father had not maintained contact with her during the pendency of the termination proceedings. Based only on what she learned at the last permanency hearing, the FCM believed Mother and Father were living apart and that Father was living with his boss. The FCM explained that after two and one-half years, neither Mother nor Father had demonstrated the ability to maintain housing or employment.

On the other hand, the foster family with whom the Children had been placed for a combined twenty months were amply providing for the Children's social, emotional, physical, and economic needs. The Children were bonded with the foster family and were

---

[4] Father pleaded guilty to class B misdemeanor false informing on May 3, 2012 and was sentenced to time served (58 days) and fined. Father's conviction also resulted in his probation being revoked in the child neglect case.

thriving. In the FCM's opinion, termination was in the Children's best interest. Further, the Children's foster parents expressed a clear desire to adopt them.

Additionally, the GAL testified with respect to Father that she had no way to contact him. She believed that as of October 1, he was working about two days a week at El Taco King and did not have a permanent residence. Further, Mother was in the process of being evicted from her current apartment. Ultimately, the GAL testified that in her opinion it was in the Children's best interest to become permanent members of their foster family and for Mother and Father's parental rights to be terminated.

During her testimony, Mother acknowledged that she had held seven short-term jobs during the CHINS proceedings and lived in multiple residences. In fact, between the final two hearing dates, Mother had been evicted from her apartment and was temporarily living with her father.

Father's own testimony, at age forty, reveals much about his lack of ability to care and provide for the Children. He acknowledged that he had never paid support for the Children and that during the CHINS and termination proceedings he did not work until May 2012. Beginning in May, he worked part-time at El Taco King for about five months and then began working at a nightclub in October. On the last day of the termination hearing in November, Father indicated that he currently lived in a shelter and had no means to provide for his children. He testified, "I'm trying to get back on my feet where I can and once I get on my feet, I'd like to, whatever my first check is I'd like to give it to my wife so I can be supportive." *Transcript* at 277. Finally, Father indicated that he wanted Mother to have

9

custody of the Children.

On January 4, 2013, the juvenile court issued findings of fact, conclusions of law, and judgment terminating the parent-child relationship between each child and Mother and Father. Father now appeals, challenging the sufficiency of the evidence.

When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* In deference to the juvenile court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204 (Ind. Ct. App. 1999), *trans. denied.* Thus, if the evidence and inferences support the juvenile court's decision, we must affirm. *Id.*

Here, the juvenile court made detailed findings in its orders terminating Mother and Father's parental rights to the Children. Where the juvenile court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143 (Ind. 2005). First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the juvenile court's conclusions or the conclusions do not support the judgment thereon. *Quillen v.*

10

*Quillen*, 671 N.E.2d 98.

We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of a constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144 (Ind. Ct. App. 2008). A juvenile court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832 (Ind. Ct. App. 2001).

Before an involuntary termination of parental rights may occur in Indiana, the State is required to allege and prove:

> (A) that one (1) of the following is true:
> > (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
> > (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
> > (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
> (B) that one (1) of the following is true:
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

11

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code Ann. § 31-35-2-4(b)(2) (West, Westlaw current with all 2013 legislation). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code Ann. § 31-37-14-2 (West, Westlaw current with all 2013 legislation)). "[I]f the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship." I.C. § 31-35-2-8 (West, Westlaw current with all 2013 legislation)(emphasis supplied).

Here, Father challenges the trial court's findings only with regard to I.C. § 31-35-2-4(b)(2)(B) and (C). In other words, he does not challenge whether the Children have been removed for a sufficient period of time or whether there is a satisfactory plan for their care and treatment.

With respect to subsection (b)(2)(B) of the termination statute cited above, we first note that the State needed to establish only one of the three requirements of that subsection by clear and convincing evidence before the juvenile court could terminate parental rights. *See In re L.V.N.*, 799 N.E.2d 63 (Ind. Ct. App. 2003). Here, the juvenile court found that the State presented sufficient evidence to satisfy two of those requirements, namely, that there is a reasonable probability the conditions resulting in the Children's removal or continued placement outside Mother and Father's care will not be remedied and that the continuation of the parent-child relationship poses a threat to the Children's well-being. *See* I.C. § 31-35-2-4(b)(2)(B)(i), (ii). We focus our inquiry on the requirements of subsection (b)(2)(B)(i) with

12

respect to Father—that is, whether there was sufficient evidence to establish a reasonable probability that the conditions resulting in removal or continued placement outside Father's care will not be remedied.[5]

In making such a determination, a juvenile court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *In re M.M.*, 733 N.E.2d 6 (Ind. Ct. App. 2000). Similarly, courts may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244 (Ind. Ct. App. 2002), *trans. denied*. The court may also consider the services offered to the parent by DCS and the parent's response to those services as evidence of whether conditions will be remedied. *Id.*

Father's argument in this regard is that the State failed to prove by clear and convincing evidence that "the original reason for removal, that being that the home was unsanitary and that the children were hungry, would not be remedied." *Appellant's Brief* at 22. He further argues, "no one visited his home, that the Family were [sic] going to the store as soon as the service providers left [at the time of the third removal] and that he was not

---

[5] Accordingly, we need not address Father's arguments with respect to the juvenile court's finding that there was a reasonable probability that continuation of the parent-child relationship poses a threat to the Children's well-being.

13

given the opportunity to have the children in his home after the second or third removal." *Id.*

We remind Father that we will not reweigh the evidence or judge the credibility of witnesses on appeal. Moreover, this court has previously explained that the language of Indiana's termination statute makes clear that "it is not just the basis for the initial removal of the child that may be considered for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside of the home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*.

The facts as set forth in detail above reveal that the reasons for continued placement outside of the home encompassed a complete lack of stability beyond simply cleanliness of the home and provision of food. Throughout the lengthy CHINS case, Father did not support his children, barely worked, did not maintain stable housing, and did not remain in regular contact with the FCM or the GAL. He also failed to attend a number of hearings and, according to the juvenile court, had trouble staying awake during permanency hearings. Moreover, Father was convicted of neglect of a dependent related to the conditions found during the first removal and violated his probation when he committed another criminal offense in early 2012, for which he was also convicted. Finally, Father's own testimony from the final day of the termination hearing reveals that he was unfit to care for the Children at the time. As set forth above, he had only been employed for a short time and was living in a shelter. Father claimed he needed more time to get back on his feet. He, however, had already been afforded extensive reunification services and more than two years to do so. In that time, he made no significant progress. *See In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct.

App. 2005) (where a "pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve"). The facts favorable to the judgment clearly and convincingly support the juvenile court's conclusion that there was a reasonable probability that the reasons for the Children's removal and continued placement outside Father's home will not be remedied.

We now turn to Father's claim that the State failed to establish that termination is in the best interest of the Children, as required by I.C. § 31-35-2-4(b)(2)(C). In this regard, Father argues:

> [T]he evidence before the trial court shows that despite being convicted of Neglect of a Dependent, Father was employed and had a place to live. The evidence showed that he consistently attended visitation with the minor children where he fed the children. That there is a strong emotional bond between himself and the children and that DCS never provided a report from a mental health profession [sic] that the children did not suffer from the loss of their contact with the parents. [sic]

*Appellant's Brief* at 24.

While the evidence presented below certainly established a bond between Father and his children, the remainder of Father's version of the evidence finds no support in the record. As already discussed, Father himself acknowledged that he had only been employed a short time, was living in a shelter, and was not yet on his feet and able to support the Children, whom he wanted returned to Mother's custody, not his. At no time did Father contend that he was in a position to have the care and custody of the Children in his own home, which at the time of the termination hearing was a shelter. Moreover, he does not indicate why DCS would have been required to provide a report from a mental health professional regarding the

15

effect on the Children of loss of contact with their biological parents.

Both the FCM and the GAL testified that termination was in the Children's best interest. The evidence establishes that the Children have developed a strong bond with their long-term foster family, have received needed therapy, nurturing, and education, and have been thriving under their care. The foster parents wish to adopt the Children and continue to give them the stability and security they deserve.

This court will reverse a termination of parental rights "only upon a showing of 'clear error'– that which leaves us with a definite and firm conviction that a mistake has been made." *In re A.N.J.,* 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here

Judgment affirmed.

BAKER, J., and VAIDIK, J., concur.